**Rickey Bernard ROBERTS, Petitioner,**

v.

**Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent.**

**No. 91–0571–CIV–KING.**

United States District Court, S.D. Florida.

June 5, 1992.

Thomas H. Dunn, Asst. Capital Collateral Representative, Office of Capital Collateral Representative, Tallahassee, Fla., for petitioner.

Ralph Barriera, Asst. Atty. Gen., Miami, Fla., for respondent.

## MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon the Petition of Rickey Bernard Roberts, a person in state custody, for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. After a jury trial in December 1985, Petitioner was convicted of first-degree murder, armed sexual battery, armed kidnapping, and two counts of armed robbery. At the conclusion of the penalty phase, the jury recommended a sentence of death. The trial judge, after independent consideration of the facts of the case, accepted the recommendation of the jury and imposed a death sentence. After Roberts' convictions and sentences were affirmed on direct appeal, the defendant filed a state habeas petition under Fla.R.Crim.P. 3.850. The denial of all post-conviction relief was subsequently affirmed by the Supreme Court of Florida.

This petition for federal habeas corpus asserts twenty-five claims for relief, alleging violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments. A final full evidentiary hearing was held on March 31 through April 2, 1992 during which the

parties presented all relevant testimony, fully briefed the issues and orally argued the issues.

## I. FACTUAL BACKGROUND

Michelle Rimondi, 16, her friend Jamie Campbell, 16, and George Napoles, 20, drove to a beach bordering the causeway, connecting Key Biscayne to the mainland, in the late evening of June 3, 1984. After pulling off the causeway and parking, the three shared some wine in Napoles' four-door Dodge Omni. Campbell fell asleep in the front passenger seat soon after they arrived. Eventually, Napoles became inebriated, and climbed into the back seat of the car to sleep off the wine while Rimondi remained in the front driver's seat of the car.

Michelle Rimondi testified that she saw a brown 1975 Toyota proceeding over the causeway from the mainland toward Key Biscayne at approximately 2:40 a.m. She observed the car cross over the median strip and proceed slowly back toward the mainland. As the driver approached the beach area on the side of the causeway where Rimondi and her two sleeping companions were parked, he pulled off the roadway and parked near their car. She attempted to rouse her sleeping companions, without success, expressing her concern and desiring to leave to go home.

She observed a man get out of the Toyota and approach her vehicle where he asked for identification and demanded to know what they were doing. Rimondi and Napoles got out of the car and handed Napoles' driver's license to the driver of the Toyota, believing him to be an undercover beach patrol police officer.

Prior to taking Napoles' driver's license back to the Toyota where he examined it under the interior light, the man leaned into the Omni vehicle to look at the sleeping Jamie Campbell. Rimondi and Napoles waited by the Omni until the man finished his examination of the driver's license, returned and ordered them to submit to a search.

In the search, the man fondled Michelle Rimondi, causing her to become further alarmed and Napoles to become suspicious of the man's intentions.

At this juncture, Napoles demanded police identification, which the man said was in his Toyota vehicle. Napoles accompanied the man to his Toyota vehicle where, upon arrival, the man reached into the back seat and pulled out a baseball bat. The man, gripping Napoles with one hand while holding the baseball bat in the other, marched him back to the Omni automobile, where he ordered Napoles to reassume the frisk position and Rimondi to look away.

With her arms and hands on the roof of the Omni automobile, she peeked under her arm and observed the man hit George Napoles on the back of his head with the bat. As Napoles commenced to fall forward, the man struck him again in the back and as he smashed face down on the rocky shore, the man continued to repeatedly beat the victim with the baseball bat.

The man from the Toyota whose actions are described in the foregoing paragraphs is the Petitioner in the federal habeas corpus proceeding, Rickey Bernard Roberts.

With the bat still clenched in his fist, Roberts seized Rimondi, pulled her to the ground and ordered her to remove her clothes, with the threat that she "was going to get just like George or worse" if she disobeyed. Upon hearing the approach of another car, the defendant made Rimondi get up from the ground and get into his Toyota. He backed his car along the beach beside the causeway until the car had gone by, parked and raped Rimondi.

After the rape, and during the next several hours, Rimondi attempted to pacify the defendant by conversing with him and assuring him that she did not mean him any harm. During this period she told him she would like to be driven home and the defendant agreed, driving on the causeway toward the toll booths at the Miami end of the causeway.

Prior to getting to the toll booths the defendant realized that he had dropped his wallet at the scene of the murder and decided to go back to get it. When Roberts arrived back where the Omni was parked,

he went to where he had left the unconscious, beaten George Napoles, still lying face down on the rocks, and rolled him over on his back. At this point, Rimondi testified, Napoles was still alive. The defendant again looked into the car, ascertained that Jamie Campbell was still asleep, found his wallet and drove off, leaving the dying victim on the shore. After leaving Key Biscayne with Michelle Rimondi, Roberts stopped again and the second rape occurred. The defendant then drove her to where she was staying at her sister's boyfriend's house, and let her out.

Rimondi went into the house, woke her sister's boyfriend, locked the doors and windows, and called the police.

George Napoles' dead body was discovered on the beach adjacent to Rickenbacker Causeway in the early morning hours.

After receiving a tip that Roberts was responsible for the murder, detectives questioned him about the incident. At first, the defendant told the police he was at a local bar until midnight then returned home, remaining there all evening. Rimondi identified Roberts' car and police fingerprint experts discovered his palmprint on the roof of the Omni at the murder scene. Confronted with the car identification and palmprint, Roberts denied being on Key Biscayne at any time within the past two months. He later changed his version of the events, stating that he went to a waterfront restaurant/bar on Key Biscayne, but the establishment was closed. A search warrant executed on Roberts' apartment yielded clothes that matched Rimondi's description, as well as a photograph of Roberts, taken June 3, wearing those same clothes.

Three weeks after the defendant's arrest, he told Rhonda Haines that he ran into Napoles and Rimondi on the beach where they used drugs and drank together. Rhonda Haines, the girl with whom Roberts was living at the time of these events, testified that Rimondi agreed to have sexual relations voluntarily with both men. She further stated that Roberts told her that he hit Napoles with a bat and killed him because Napoles was bothering Roberts with complaints about how much time he was taking in the sexual act with Rimondi.

A subsequent theory of defense, first advanced in opening statement of counsel for the defense at the state court trial and relied upon by counsel in this federal habeas corpus petition is that George Napoles was murdered by two men (Ward and Cebey) who somehow appeared at the murder scene to protect Michelle Rimondi from the sexual advances of George Napoles.

During the trial, Roberts took the stand and testified that he had driven over on Key Biscayne on the night of June 3, 1984, where he had spent some time at a hotel bar and, on returning over the causeway to the mainland, picked up Michelle Rimondi who was hitchhiking on the causeway. He said that Rimondi asked him to go with her to pick up her purse from the car in which her friends were sleeping, which he agreed to do. While picking up Rimondi's purse from the Toyota automobile, he leaned over the car and looked in at the sleeping George Napoles and Jamie Campbell, placing his hand on the roof of the automobile.

After picking up Rimondi's purse, the defendant testified that he drove her home without any unusual incident. He denied raping the girl twice and murdering George Napoles.

The defendant was indicted for first-degree murder, armed sexual battery, armed kidnapping, and two counts of armed robbery on June 21, 1984. A trial by jury was commenced on December 3, 1985. After a three week trial, the jury deliberated for twenty-three hours and found Roberts guilty of first-degree murder, armed sexual battery, and armed kidnapping. He was acquitted of the robbery counts by the jury.

The sentencing phase was conducted on December 18, 1985. At the conclusion of that proceeding, the jury recommended the death penalty by a vote of 7–5. The trial court after independent consideration followed the jury's recommendation, found four statutory aggravating circumstances: (1) The defendant had been previously convicted of a violent felony; (2) at the time of the commission of the capital felony the

defendant was under a sentence of imprisonment; (3) the capital felony was committed while the defendant was engaged in the commission of or the attempt to commit a sexual battery, and (4) the capital felony was "especially heinous, atrocious or cruel." The trial court found no mitigating circumstances.

## II. PROCEDURAL HISTORY

The Florida Supreme Court affirmed the defendant's conviction and sentence. *Roberts v. State*, 510 So.2d 885 (Fla.1987). On August 29, 1989, the Governor of Florida signed a death warrant setting the execution for October 31, 1989. Roberts timely filed a motion to vacate his sentence under Fla.R.Crim.P. 3.850 on September 28, 1989. The trial court denied the motion without holding an evidentiary hearing. Roberts appealed, and petitioned for a writ of habeas corpus. The Florida Supreme Court stayed defendant's execution, but ultimately denied all postconviction relief on September 6, 1990. *Roberts v. State*, 568 So.2d 1255 (Fla.1990). There is neither a death warrant nor a stay of execution in effect at the present time.

The instant petition for writ of habeas corpus was subsequently filed in this Court. A trial was held on March 31 through April 2, 1992 on the issues raised in the petition and response thereto, in the United States District Court.

## III. GUILT–INNOCENCE PHASE CLAIMS

1. *Application of Florida's Rape Shield Law*

Petitioner claims that application of Florida's Rape Shield Law, Fla.Stat.Ann.

§ 794.022[1], denied him his Fifth and Sixth Amendment Rights to present a defense, to cross-examination of adverse witnesses, and to testify in his own behalf. Fla.Stat. Ann. § 794.022.

The prosecution filed a motion *in limine* to exclude reference to Rimondi's alleged prior consensual sexual conduct under the state shield law. R. at 276–79. After hearing argument of counsel, the court granted the State's motion *ore tenus*, and excluded evidence of the victim's prior sexual conduct "without first obtaining permission from the court outside the presence and/or hearing of the jury." R. at 276.

On direct appeal, the Florida Supreme Court found this issue meritless. *See Roberts v. State*, 510 So.2d 885, 892 (1987). The court recognized that "if application of Florida's Rape Shield Law interfered with Roberts' confrontation rights or otherwise operated to preclude Roberts from presenting a full and fair defense, the statute would have to give way to these constitutional rights." *Id.* For that proposition, the court relied on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), a case holding the common-law rule that a party may not impeach his own witness violative of due process when it operates to prevent cross-examination. The Florida Supreme Court found that Roberts was able to present a complete defense without the "irrelevant and highly prejudicial" evidence Petitioner sought to introduce. *Id.*

Since the direct appeal was decided, the Supreme Court has handed down the more apposite cases of *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513

---

**1.** The Florida Rape Shield law provides in relevant part:

(2) Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution [for sexual battery]. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is

first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.

(3) Notwithstanding any other provision of law, reputation evidence relating to a victim's prior sexual conduct or evidence presented for the purpose of showing that manner of dress of the victim at the time of the offense incited the sexual battery shall not be admitted into a prosecution [for sexual battery].

(1988) and *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

In *Rock*, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify in his own behalf. 483 U.S. at 62, 107 S.Ct. at 2714–15. The Court relied upon and extended its decision in *Chambers*, 410 U.S. 284, 93 S.Ct. 1038, reasoning that a state "may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." 483 U.S. at 55, 107 S.Ct. at 2711. The holding applied the *Chambers* rule regarding the testimonial competence of material witnesses to criminal defendants themselves.

In *Olden*, the defendant, a black man, was accused of raping a white woman, Mathews. The trial court suppressed evidence of Mathews' interracial cohabitation with another man, Russell, as prejudicial under Kentucky's rules of evidence. Olden's theory of the case was that the sex with Mathews was consensual, and that Mathews had fabricated the rape story to protect her relationship with Russell, who would have become suspicious upon seeing her get out of another man's car. Olden therefore sought to introduce evidence of Mathews' and Russell's current cohabitation, in order to establish Mathews' motive to lie.

The Supreme Court held that exclusion of the cohabitation evidence violated Olden's right of confrontation. *Id.* 109 S.Ct. at 482–84. The Court reaffirmed that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which the jurors ... could appropriately draw inferences relating to the reliability of the witness." *Id.* at 483 (citations and quotations omitted). In effect, the Court held that Olden's Sixth Amendment rights outweighed any prejudice from disclosure of Mathews' interracial and extramarital relationship with Russell.

This Court's independent review of the instant petition under *Rock* and *Olden* does not compel a result different from that reached by the Florida Supreme Court.

■ Trial counsel Lange did *not* seek to introduce evidence of Rimondi's sexual history in order to prove Defendant's innocence or that the murder was committed by others. One searches the record in vain for any theory that Rimondi's prior sexual conduct was relevant to any issue in this case. At the state trial, defense counsel sought to introduce the precluded evidence for the very purpose prohibited by the Rape Shield Law—impeachment of a rape victim's credibility because of her prior consensual sexual activity.

Roberts testified at trial that he did not rape Rimondi or have sexual relations with her. Nevertheless, his counsel argued the "consent" exception under the state rape shield law.

THE COURT: Doesn't this rape shield statute indicate that not only has to be a pattern of consent has to fit in with what occurred allegedly at the time of the rape?

[THE STATE]: That's my understanding.

[THE DEFENSE]: Consent has to be an issue.

Why consent—it has been consent. Has been statements of Rick's former girlfriend, Rhonda Haines, which she gave about a month ago for the first time allegedly that Rick confessed to a consensual sexual activity between Michelle, according to Rhonda Haines, months ago that Rick encountered Napoles and Michelle Rimondi on the beach. They got talking, did drugs together and they had sex together. Michelle agreed to have sex with both Roberts and the dead guy, Napoles. And according to Rhonda Haines, this came from Rick, supposedly.

THE COURT: There is no allegation that any money changed hands at that time?

[THE DEFENSE]: No issue. It is just consent. Whether consent—Rhonda Haines' allegation as to what Rick told

her three weeks after the arrest about this places consent at issue because she says if you are to believe her and the jury has to listen to it, that Rick told her that it was—it was a consensual sexual encounter; Michelle agreed. She wasn't raped. She agreed to have sex voluntarily with Rick and with George and it was only according to Haines that Rick told her it was only after George Napoles felt that Rick was hogging Michelle; having taken to much time in the sexual act and that Napoles got offended and started to hassle Rick. Rick hit him with a bat and killed him.

But the sexual interaction between Haines points out—between Rick and Rimondi was consensual. That's why consent is an issue.

R. at 1515–16. On the basis of defense's proffer of relevancy, the trial judge granted the state's motion *in limine.* R. at 1517.

There is no evidence in this record to substantiate either the (1) partying with consensual sex theory or, (2) the murder of Napoles by friends of Rimondi theory.[2]

The question before the federal habeas court is not whether the state court improperly excluded evidence, but whether a violation of defendant's constitutional rights resulted therefrom. *See Estelle v. McGuire,* — U.S. —, —, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Dickson v. Wainwright,* 683 F.2d 348, 350 (11th Cir.1982) ("An evidentiary error does not justify habeas relief unless the violation results in the denial of fundamental fairness"). Exclusion of evidence cannot infringe upon Defendant's right to present a full and fair defense if the defense now posited, created from the suppressed evidence, did not exist at time of trial.

*Olden, supra,* is not to the contrary. In that case, the cohabitation of the rape victim, Mathews, and her boyfriend, Russell, was both a certainty *and,* from the outset, formed the very basis of defendant's sole theory of the case. The Supreme Court noted that at the time of trial, the two had separated from their respective spouses and were living together. 109 S.Ct. at 482. Over Olden's "vehement objections," the trial court granted the prosecutor's motion *in limine* to keep out evidence of Mathews' and Russells' living arrangements from the jury. *Id.* At trial, Mathews apparently perjured herself by testifying that she was living with her mother. The trial court sustained the State's objection to Olden's attempts to cross-examine Mathews on this point. *Id.* The "exclusion" of Roberts' current theory of the case, found nowhere in this record, differs markedly from the suppression of Olden's pivotal and consistently maintained defense. It is axiomatic that a criminal defendant must stand on those objections actually urged on the trial court, and may not enlarge, add to, or otherwise change the argument offered contemporaneously at some later point in the proceedings. *See* C.J.S. *Appeal and Error* § 253. As noted, the motion *in limine* granted by the trial judge only barred evidence of Rimondi's prior consensual sex "without first obtaining permission from the court outside the presence and/or hearing of the jury." R. at 276. If Roberts' theory changed at any point during the trial, the defense could have revisited the shield law issue at that time. The defense did not make any proffer resembling Roberts' current theory. Post-conviction counsel is not free to create additional *post hoc* trial strategies, based on novel interpretations of excluded evidence and non-existent facts.

Therefore, upon independent review, the Court finds that Roberts was not deprived of his right to present a full and fair defense. Roberts' original theory that Ward or Cebey actually committed the murder was fully presented to the jury. After discussing Rimondi's and Cebey's romantic relationship, defense counsel told the jury in opening statement' that either Ward or

---

**2.** Indeed, there was strong evidence that the friends, Cebey and Ward, were nowhere near the crime scene on the night of murder. Each presented solid alibis that were subjected to full cross examination by defense counsel. Additionally, both men submitted fingerprint and blood samples for testing. No link to the crime was established thereby.

Cebey were more likely suspects.[3] In closing argument the defense again forcefully argued the same theory.[4] The defense had full opportunity to cross-examine Ward and Cebey. This extensive cross-examination did not establish any facts to support the defense theory that Ward and Cebey were the murderers.

■ The Court similarly finds no constitutional violation in the trial court's prohibiting Roberts from testifying on direct to a statement Rimondi allegedly made to him that she worked for an escort service as a prostitute. Rimondi was permitted to testify that during the drive from the causeway, Roberts told her that he was a "professional hit man." Roberts did testify that they "had general conversations about occupation." Petitioner claims that the trial court's ruling (1) deprived Roberts of an opportunity to rebut Rimondi's account of her conversation with Rimondi, and (2) that the Roberts' alleged statement, taken out of context, was highly prejudicial.

Petitioner's first contention lacks merit. The excluded statement was not in any way inconsistent with Rimondi's testimony, and thus does not impeach her version of the conversation. Petitioner argues that Rimondi's statement was relevant to show that the conversation between them was not hostile or threatening. At trial, the State objected just as Roberts was about to testify that Rimondi told him she worked for an escort service. Outside the presence of the jury, defense counsel argued the relevance of the statement:

[THE DEFENSE]: No, it's not raised for consent.

It's raised for them having a normal conversation and them talking about my girlfriend works as a hooker, we have something in common.

He had a normal conversation during the course of that drive.

·He has a right to portray that conversation with her. He had a normal conversation, just like the State had a right to protray [sic] the conversation, deviate conversation or a criminal conversation.

R. at 2778.

Rimondi's version of the conversation is not contradictory to the defendant's statement of what was said on the ride home. She testified that there were in fact long periods of "normal" conversation, and that she made every effort to gain the Petitioner's confidence. For instance, Rimondi testified that they smoked Roberts' cigarettes together, she voluntarily paid the causeway tolls, and she held Roberts' hand to help gain his trust while they searched for his wallet at the crime scene.

Rimondi's alleged statement concerning her employment as a prostitute would not have made the conversation appear so much more "normal"—if it would have done so at all—that its exclusion amounts to a constitutional violation.

---

**3.** Lang explained the defense strategy in his opening:

> What happened had to have happened that night as the evidence will lead you. You conclude that during the course of George Napoles, Campbell and Michelle Rimondi being on the beach drinking wine, either the very bad tempered and desirous Joe Ward knew that they had gone to Key Biscayne and went down there: *Either one of them confronted George Napoles which is really the innocent party in this whole thing—and jealously—whether it was Ward or Cebey, got in an argument with George and beat George Napoles to death.*

R. at 850.

**4.** *See* closing arguments, R. at 3047 ("Now, I don't have to prove who did it. I came to you and I said the evidence will show you that someone else did it other than Rickey Roberts, and I told you from the evidence, two likely candidates are either Cebey or Ward because of their relationship and their situation with Rimondi") R. at 3043 ("Manny Cebey and Joe Ward ... were much more likely, still more likely to have been the killer, certainly much more than Rickey Roberts"); R. at 3046 ("[Cebey] goes out to the Key and he committed the murder and because [Rimondi] is in love with him ... she covered for him"); R. at 3045 ("And Ward went out to the Key after that and confronted, confronted Campbell and Rimondi and George Napoles and Joe Ward, because he is extremely violent, extremely dangerous, always has a horrible temper, he does what he does best and that is hurt people, just like the time he hurt the City of Miami police officers in the battery conviction. He did the same thing to Napoles").

*Rock, supra,* does not stand for the proposition that a criminal defendant's right to present relevant testimony is absolute. Rather, the *Rock* Court held that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." 483 U.S. at 55, 107 S.Ct. at 2711. The Court reaffirmed that in appropriate cases, the right may " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Id.* at 55–56, 107 S.Ct. at 2711 (quoting *Chambers, supra* ).

Upon this record, this Court concludes that exclusion of Rimondi's statement was neither arbitrary, nor disproportionate to the legitimate purposes served by the Florida Rape Shield Statute.

■ Petitioner's second contention is similarly unavailing. Rimondi's testimony that Roberts told her he was a "professional hit man," like any other adverse evidence, is damaging to the defense. However, at trial, Roberts did not seek to put the statement in context, nor explain his motivation for saying it—*he denied ever making the statement in the first place.* [5] Clearly, Roberts could not dissipate the impact of the statement by proving the full context of the statement, if his claim is that the statement was never made. Roberts may not deny the statement, yet claim that *if* he did make the statement, he is entitled to provide the context under which it was made. There is no prejudice, where Roberts claims that his part of the conversation never took place.

### 2. *Ineffective Assistance of Counsel*

Petitioner claims ineffective assistance of counsel for numerous instances of alleged deficient attorney performance at trial.

The trial court summarily denied these claims without an evidentiary hearing after hearing argument. Resp.App.C. at 437. The Florida Supreme Court agreed that an evidentiary hearing was unnecessary.

*Roberts,* 568 So.2d at 1259, 1260. The court concluded that Roberts' claims were all either procedurally barred, lacked merit, or were "devoid of adequate factual allegations and therefore insufficient on their face." *Id.* at 1259.

Pursuant to the Eleventh Circuit's mandate in *Agan v. Dugger,* 835 F.2d 1337 (11th Cir.1987) *reh'g denied, en banc,* 840 F.2d 25 (1988), this Court held an evidentiary hearing on March 31 through April 2, 1992. The petitioner offered the testimony of Roberts' original counsel, Thomas E. Scott, Scott's legal assistant during the representation, Eileen Rooney, Roberts' trial counsel, Kenneth Lange, the state prosecutor originally assigned to this case, Sam Rabin, and defendant's family members.

### A. Ineffective Assistance Standard

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set out a two-pronged standard for an ineffective assistance of counsel claim:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense.* This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders that result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064 (emphasis added).

---

**5.** On direct examination, Roberts testified as follows:
 Q. Rick, during the course of this drive back to her house, did you ever threaten her in any way?
 A. No, I didn't.
 Q. Did you tell her that you were some kind of professional killer or professional hit man?
 A. No, I did not.

■■■ Counsel's *performance* must be evaluated for "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2064–65. The reviewing court "should presume effectiveness and should avoid second-guessing with the benefit of hindsight." *Horton v. Zant,* 941 F.2d 1449, 1460 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). Tactical decisions of counsel are entitled to broad deference. *See Scott v. Dugger,* 891 F.2d 800 (11th Cir.1989) (counsel not ineffective for failure to cross-examine and present impeaching evidence), *cert. denied,* —— U.S. ——, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990); *Jones v. Smith,* 772 F.2d 668 (11th Cir.1985) (counsel not ineffective where counsel made tactical choice not to make opening argument), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986).

■■■ In order to establish *prejudice,* the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

### B. Specific Claims

■■ 1. *The jury view of the crime scene.* Petitioner alleges counsel's failure both to object to a view of the crime scene requested by the jury or advise Roberts to attend the view amounts to ineffective assistance of counsel.[6]

During the guilt phase of the trial, after approximately 14 hours of deliberations, the jury requested a view of the beach along Rickenbacker Causeway where the victim's body was found.

Neither defense nor state counsel objected to the jury view. Defense counsel, without Roberts, went to the scene of the murder with the prosecutor in order to establish the approximate position where the body was found, before the jury arrived. The attorneys then left the scene and the jury was brought to conduct their view without either counsel or the defendant being present during the view.

At the federal habeas evidentiary hearing, Mr. Kenneth Lange, the defense counsel for Roberts in the state trial, testified that he did not object to the view by the jury or advise his client he had a right to be present when the jury viewed the crime scene, because he feared that by objecting, the jury might not be able to reach a verdict. He testified that if the jury did not reach a verdict, he would have to retry the case "for free". Astoundingly, he said his decision to not object was *entirely personal to him.* He said his motivation was not a tactical decision he made in the best interest of his client.[7]

■■ The Court finds this testimony unworthy of belief. First, there was absolutely no possibility of any benefit to the defendant to be physically present in sight of the jury while they conducted their view. This will be discussed in more detail in this opinion later. It would have been poor advice for the lawyer to have either objected to the view or insisted that his client be

---

**6.** The Florida Supreme Court did not address this claim in its written opinions. A claim presented to the state court but not ruled on is considered exhausted. *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978). Neither party has represented that the instant federal claim has been so presented. Respondent has not argued inexhaustion in opposition to the claim. Thus, even if the claim was not presented to the state court, the claim must now be considered by the district court as the state has waived the exhaustion requirement. *See Battle v. Thomas,* 923 F.2d 165 (11th Cir.1991).

**7.** Defense counsel set out his motivations as follows:

The reason was that at the time in the State of Florida for a capital case there was no ability to get excess attorneys fees above the statutory maximum of $3,500, no ability at all, could not get one penny more than $3,500.

\* \* \* \* \* \*

If you honestly want to know what I was thinking at that moment, I was thinking 14 hours into the case it was likely a hung jury, the last thing that I wanted was a hung jury because I would have to retry the case for free because there was no provision at the time to exceed the $3,500.

Lange, testimony at 35–36 (March 31, 1992).

present. The decision not to object and to waive his client's presence was therefore a good, sound legal decision in the best interests of the defendant.

Second, it is inconceivable that the former prosecutor, of Mr. Lange's reputation in the community for conscientious preparation and advocacy on behalf of his clients, would risk his entire career by placing personal reasons and financial gain above that of his responsibility to his client. It is the duty and responsibility of every lawyer to at all times maintain foremost the best interests of his client. To do otherwise violates his attorney's oath and discredits himself.

Third, careful review of the entire record in the state trial reflects that Mr. Lange vigorously defended this case on behalf of the defendant and made some tactical choices and decisions for his client that were consistent with the facts as he found them. The record belies the testimony as Mr. Lange gave it regarding his motivation on this issue.

Fourth, although defense counsel, Kenneth Lange, testified at the federal habeas corpus hearing in March/April, 1992 that he did not advise his client of his right to be present at the jury view and that his client did not waive the right to be present, the record sadly also belies this testimony.

As a preliminary matter, the Court notes that the record reflects that Lange *did* advise his client of the jury view, and subsequently represented to the trial court that defendant waived his right to attend. After the view, the following colloquy ensued:

THE COURT: Were you there to watch the jury from a distance?

[THE STATE]: No.

THE COURT: You all left?

[THE STATE]: We left and, as far as walking to the positions, we go in the car and left.

The only thing what happened was put on the record, just to be on the safe side, *is that the counsel for defense waived the presence of the Defendant there.*

THE COURT: Counsel for the Defendant, is that correct?

[THE DEFENSE]: Yes sir, that's correct, what I indicated before.

[THE STATE]: I think that was the discussion.

For the record, *there was a discussion in the courtroom between, in the presence of the Court, between yourself and your Defendant as to this issue.*

[THE DEFENSE]: That's correct, Your Honor.

Overall, we admit that counsel waived the presence of, Your Honor.[8]

---

8. On direct appeal, Roberts pointed to the comma between the words "of" and "Your Honor" in this sentence, contending that the words "the defendant" were left out of the transcript. Petitioner has made this "ambiguity" in the transcript the subject of a separate claim for habeas claim, alleging that "profound reliability questions are raised" by a trial record "shot through with such errors as be incomprehensible." Pet. at 264–266. The absence of a full and complete record of the trial, Petitioner claims, forecloses meaningful appellate review and thus amounts to a due process violation.

The state argues that this precise claim is unexhausted. Resp. at 120. The issue appears nowhere in Petitioner's direct appellate briefs. The Florida Supreme Court noted Petitioner's differing interpretation of the record, but found that the transcript was susceptible of only one reasonable interpretation. *See Roberts,* 510 So.2d at 890. The Courts finds that the precise constitutional issue was not brought before the state court.

It is clear, however, that state collateral relief would have been unavailable because of the procedural lapse. *See, e.g., Roberts,* 568 So.2d at 1257–58 (finding claims not raised on direct appeal to be procedurally barred). Therefore, because raising the claim in state habeas proceedings would have been futile, Petitioner has exhausted his state remedies under 28 U.S.C. § 2254(b). *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1068, 103 L.Ed.2d 334 (1989). Although dismissal is inappropriate, this claim is barred in this Court, absent a showing of cause for the default and prejudice resulting therefrom. *Id.*

Petitioner can demonstrate no actual prejudice from the "ambiguity" in this record. Indeed, making the "correction" urged by the petitioner only bolsters the state's contention that Petitioner's presence at the jury view was waived. The defect in the trial transcript, if any, did not prejudice the Petitioner in any way. Accordingly, this claim is denied.

[THE COURT]: At the scene that you viewed, is that correct?

[THE DEFENSE]: Yes sir, I said that's correct.

R. at 3215–16. The record also indicates that Roberts was present when the trial court granted the jury's request and instructed them on the view.

Yet, at the federal evidentiary hearing six years later in this Court, Lange testified, "I did not tell him [Roberts] he had a right to be present. I did not tell him that he—that I felt that he had the right to have the Judge present at the Jury view. I did not tell him that he had I felt a certain input that he could give in recreating that jury view so that it would be as accurate as possible to what the alleged crime scene supposedly was at the time." Lange Test. at 35 (Mar. 31, 1992). The record supports the conclusion that Lange discussed the jury view with Roberts, and then waived his presence.

The Court can only conclude that Mr. Lange, in giving his testimony at the federal habeas corpus proceeding, regarding his private mental processes in making tactical decisions in this case, was prepared to say anything to help his client, regardless of how bad it made him look personally or whether the trial record of defendant's case substantiated the position he now takes.

However, even assuming that Defense counsel did not adequately inform Roberts of his right to attend the view, the claim fails both prongs of the *Strickland* test.

While Lange testified in this Court that his actions were motivated by personal financial reasons, he also stated that he believed the jury view would lead to a verdict. Lange testified that he assumed a view would "get [the jury] off what appeared to be a hung jury so that they would come back with a verdict, either a lesser included offense of second degree murder or attempted first degree murder or manslaughter." Lange Test. at 37 (Mar. 31, 1992). This constitutes a reasonable tactical decision.

It is also clear that a decision now asserted to be counsel error did not prejudice the

Defendant. At the jury view, no talking was permitted. The judge instructed the jurors not to discuss the case among themselves at the scene. R. at 3203. The attorneys were not allowed to address the jury in any way. *Id.* No evidence was presented to the jury at the scene.

Given the position Defendant took at the trial when he testified that he picked up a hitchhiker, accompanied her to retrieve her purse from the car and then left the scene with Napoles peacefully sleeping in the back seat of the Toyota, it is difficult to follow counsel's argument that Defendant could have assisted his lawyer in locating the position of the dead body if he had been present when the jury viewed the murder scene.

Rather than helping defendant's cause, the defendant's presence at such a proceeding could likely have been detrimental.

The Court concludes that Roberts' absence from the jury view does not undermine confidence in the outcome of the trial. *See Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (defendant "gains nothing" by presence at jury view of murder scene where he is prohibited from speaking to the "showers" of the scene, providing suggestions and giving advice) *overruled on other grounds, Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The decision to waive Defendant's presence was clearly a correct decision.

2. *Failure to Impeach Rhonda Haines with Prior Inconsistent Statement.* Rhonda Haines, the woman Roberts was living with at the time of his arrest, testified at trial that Roberts had confessed to the murder to her. Before Haines told the prosecution of Roberts' confession, the defense had planned to call her as a defense witness. Apparently she made a statement shortly after defendant's arrest, confirming defendant's alibi on the night of June 3, to Eileen Rooney, a paralegal employed by Roberts' original attorney, Thomas E. Scott. Later Haines changed her testimony to say Defendant had confessed the murder to her. Because Mr. Scott antici-

pated his paralegal Rooney being called to impeach Haines, he asked leave of court to withdraw. Petitioner now alleges that his trial counsel (Lange) was ineffective for not calling Mr. Scott or one of his associates to rebut Haines' testimony at trial concerning Roberts' alleged statement that he murdered Napoles.

At the evidentiary hearing in this Court, Lange testified that his only reason for not calling Mr. Scott as a witness, was that he was soon to be appointed a federal judge in the Southern District of Florida, and that Lange "did not want to do anything that would sort of annoy [Judge Scott] or anger him, that might jeopardize possible court appointments coming out of the federal court."

■ First, Mr. Scott's testimony at the evidentiary hearing made it clear that he would have been an incompetent witness: *Haines did not make any exculpatory statements directly to Scott, but rather to Scott's paralegal* Eileen Rooney. Mr. Scott was not present when Haines gave her alibi statement to Rooney and any testimony by him would have been inadmissible hearsay.

Lange's testimony in the federal habeas proceeding in the case at bar is indeed troubling. As noted above, every attorney takes an oath upon admission to the bar that he will never place his personal financial gain or well being above that of the best interests of his client. In giving the testimony that he did, regarding his motivation for not calling attorney Thomas Scott,—if he truly thought that by calling him it would help his client Roberts,—he may well have violated his oath as an attorney. The other troublesome aspect is Mr. Lange's believability since his testimony indicates that he was unaware of the fact that United States magistrate judges make all initial appointments under the Criminal Justice Act for indigent defendants in the United States District Court for the Southern District of Florida.

The Court finds that Petitioner was not prejudiced by counsel's failure to call Scott or Rooney. The jury heard that Haines had given inconsistent versions of the events before trial. She testified that she initially provided Roberts with an alibi because she loved him, and was attempting to protect him. As to Haines' trial testimony of Roberts' alleged confessions to her, the jury was aware that: 1) she spent three weeks in jail charged with being an accessory after the fact; 2) she was anxious to be released from jail; 3) she had eleven outstanding arrest warrants for prostitution; and 4) the state dropped the accessory charges, released her from jail and did not pursue the arrest warrants *immediately after* she came forward with Roberts' confessions and agreed to testify against him. Defense counsel's theory that the changed testimony was the result of a "deal" with the State for lenient treatment was forcefully presented to the jury. In closing argument, Lange summarized the impeachment by arguing "[Haines] has got a big daddy protector, the prosecutor's office in Dade County who says don't worry about it." R. at 3077. The fact that she did not tell Scott and his associates of the confession evidence is consistent with Haines' testimony at trial (i.e., she initially tried to protect Roberts), and would not add much, if anything, to defense counsel's thorough impeachment of Haines. Calling Scott's paralegal in rebuttal would not have significantly lessened the impact of the confession evidence.

3. *Other alleged deficiencies.* Petitioner claims that counsel was ineffective in the following respects: 1) counsel failed to learn of money payments to Rimondi by the state; 2) counsel failed to adequately cross-examine certain State witnesses about charges pending against them; 3) counsel failed to confront State witnesses with inconsistencies in their prior statements; 4) counsel did not interview persons familiar with Roberts' drug and alcohol use on the night of the murder; 5) counsel failed to object to "security measures," "venue" and to "insure a conflict free representation; and 6) counsel failed to prepare adequately for trial.

Each of these allegations lacks merit.

■ Addressing each in turn, the Court makes the following conclusions.

First, as was made clear at the evidentiary hearing, the "money payments" to Rimondi were merely per diem expenses, normally paid to state witnesses, while she attended depositions. *See* Test. of Samuel Rabin. Second, Roberts was not prejudiced by any failure of defense counsel to further impeach the State's witnesses. Third, the Court finds that defense counsel was highly effective in impeaching State witnesses based on prior inconsistent statements. No constitutional error results from counsel's failure to exploit every potential inconsistency. Fourth, since defense counsel filed a successful motion *in limine* to exclude evidence of Roberts' drug and alcohol use from trial, R. at 291–291, counsel was necessarily not ineffective for interviewing every potential witness to such use.

In any event, the Court notes that counsel was aware of the drug and alcohol evidence and could have presented it, if he deemed it prudent to do so. This evidence was obviously inconsistent with defendant's theory of innocence (i.e., he gave a hitchhiking girl a ride home). Petitioner's fifth argument is unsubstantiated, either by the habeas petition or the evidentiary hearing, and is deemed abandoned. As to each of the foregoing claims of error, the Court concludes that counsel's performance was reasonable under prevailing professional norms.

### 3. Brady Claims

Petitioner alleges that the State withheld information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and improperly denied access to Rimondi's rape treatment file in violation of *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

Petitioner asserts that the State failed to provide the following material exculpatory information to the defense: (1) evidence that Rimondi was given "cash payments as an inducement to testifying for the State;" Pet. at 39; (2) efforts to improve and maintain Rimondi's "image," which included contact with Rimondi's father; (3) statements by the physician who treated Rimondi for sexual assault that Rimondi appeared too "cool and collected;" (4) scientific information that a positive result for ejaculate could have occurred if Rimondi had sex for many hours before the crime; (5) evidence of Ward's propensity for violence; (6) evidence of Campbell's bad character.

Upon a full consideration of the evidentiary hearing in this Court, petitioner's exhibits, and the entire record, the Court concludes that these claims are wholly unsubstantiated. The Court determines that all of the alleged "exculpatory information" was either immaterial, or already in petitioner's possession. These claims are denied as meritless.

### Ritchie Violation

Before trial, defense counsel attempted to discover whether Rimondi gave an inconsistent version of rape and murder to her rape treatment counselor, Denise Moon. Rimondi was counseled on a weekly basis up to the time of trial by Moon, a state employee who joined the state attorney's office as a witness coordinator shortly after Rimondi's treatment began. At her deposition, Moon refused to disclose the contents of her discussions with Rimondi, relying on a state law counselor/sexual assault victim privilege. Defense counsel sought leave of court to reopen the deposition, arguing that Roberts had a Sixth Amendment right to learn of any inconsistencies in Rimondi's version of the events. R. at 620. Roberts' motion was denied by the trial court, apparently on grounds that Moon's employment with the state attorney's office rendered any communications with her privileged as "work product." R. at 631.

In the instant petition, Roberts advances a generalized *Brady* claim alleging that the prosecution team may have suppressed material exculpatory information, and makes a specific Confrontation Clause argument under *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

In *Ritchie,* a father was charged with sexual assault on his teen-age daughter. When the assault first occurred, Pennsylvania's Children and Youth Services department (CYS) investigated the matter. Before trial, defendant requested disclosure

of files related to the incident. CYS refused to provide the materials, claiming that the records were privileged under state law.

The Supreme Court rejected the proposition the that Sixth Amendment created an absolute right to discovery. The Court reaffirmed that "[n]othing in the caselaw supports [the] view" that the Confrontation Clause is a "constitutionally compelled rule of pretrial discovery." *Id.* at 52, 107 S.Ct. at 2709. The Court clarified:

> The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.

*Id.* (citations omitted). Because Ritchie was able to cross-examine all of the trial witnesses fully, the failure to disclose the CYS file did not amount to a Confrontation Clause violation. However, the Court found that Ritchie's arguments were more properly understood as due process claims, and held that defendant had a right to have the CYS file reviewed by the trial court *in camera,* to determine if it contained information that probably would have changed the outcome of the trial. *Id.* at 58, 107 S.Ct. at 2712–13.

Roberts did not include the *Ritchie* claim in his direct appeal. On that ground, the Florida Supreme Court did not address the merits of Petitioner's federal claim contained in a postconviction motion, ruling it procedurally barred by state law. *See Roberts v. State,* 568 So.2d 1255, 1257–58 (Fla. 1990).

The *Ritchie* claim is therefore procedurally defaulted in this Court. The Florida Supreme Court unmistakably relied upon an "independent and adequate state ground" in resolving the claim. *See Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991). Consequently, Petitioner may not obtain federal habeas corpus relief, absent a showing of "cause and prejudice." *Id.* at 2563; *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

The requisite "cause" element is not precisely defined, but ordinarily requires a showing that "some objective factor external to the defense impeded counsel's efforts" to construct or raise a claim. *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 2647, 91 L.Ed.2d 397 (1986). The Supreme Court has found objective factors that constitute cause include: (1) interference by officials that makes compliance impracticable; (2) a showing that the factual or legal basis for a claim was not reasonably available to counsel; and (3) constitutionally ineffective assistance of counsel. *See id.* at 486–88, 106 S.Ct. at 2644–45. "Prejudice" means a reasonable probability that the result of the proceeding would have been different but for the constitutional defect. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

The Court finds that Petitioner cannot show cause for the procedural default. The tools were at hand to construct such a claim at the time Roberts filed his motion for postconviction relief. A due process challenge based upon *Brady* and its progeny was clearly available. Moreover, a specific *Ritchie* claim also could have been stated. The Supreme Court granted certiorari in *Ritchie* on May 27, 1986. 476 U.S. 1139, 106 S.Ct. 2244, 90 L.Ed.2d 690. Petitioner's initial direct appellate brief in the Florida Supreme Court was filed two months later, on July 28, 1986. The legal basis for the constitutional claim was reasonably available to appellate counsel.[9] *See Reed v. Ross,* 468 U.S. 1, 16,

---

**9.** Indeed, appellate counsel argued other claims on the basis of cases that had been recently granted certiorari. Roberts argued that the death penalty is arbitrarily applied in Florida based on the race of the victim, citing to the then-pending cases of "*Hitchcock v. Wainwright,* [481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) ]; *McCleskey v. Kemp,* [481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) ]."

104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984); *Pitts v. Cook,* 923 F.2d 1568, 1568 (failure to raise *Batson*-type challenge during voir dire not ineffective where certiorari was granted in *Batson* several weeks before petitioner's trial). No "external impediment" prevented appellate counsel from constructing or raising the claim. *See Carrier,* 477 U.S. 478, 491–92, 106 S.Ct. 2639, 2647–48, 91 L.Ed.2d 397 (1986) (applying cause and prejudice standard to procedural default on appeal).

■ Nor may the procedural default be attributed to constitutionally inadequate assistance of counsel.[10] The "proper standard for attorney performance is ... reasonably effective assistance." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In analyzing attorney performance in the context of procedural default, the Eleventh Circuit has recognized that there can be a "gap" between what counsel *could* have raised (i.e., the legal basis was *available*) and what counsel constitutionally *must* have raised in order to render effective assistance. *See Pitts,* 923 F.2d at 1573; *Pelmer v. White,* 877 F.2d 1518, 1523 (11th Cir.1989) ("[b]ecause law is not an exact science, an ordinary, reasonable lawyer may fail to recognize or to raise an issue, even when the issue is available, yet still provide constitutionally effective assistance").

The Court finds that no constitutional violation resulted from appellate counsel's failure to raise a *Brady/Ritchie* claim on direct appeal. The fact that counsel may have missed the issue, or chose not to include it for strategic reasons, here does not fall below the range of reasonable attorney performance.

■ Finally, Petitioner may not avail of the miscarriage of justice exception to this procedural bar. In extraordinary cases, a federal court has the equitable power to consider an issue notwithstanding the existence of a default. A federal court may do so "where the constitutional violation has probably resulted in one who is actually innocent." *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649; *Johnson v. Singletary,* 938 F.2d 1166, 1175 (11th Cir.1991) (*cert.* pending). Petitioner seeks disclosure of Moon's files for impeachment evidence. Pet. at 62. After thoroughly reviewing Rimondi's testimony at trial, the Court concludes that further impeachment of Rimondi with more prior inconsistent statements would not effect the outcome of the trial. It cannot be said that the trial court's denial of disclosure probably resulted in the conviction of an actually innocent man. Here, the evidence of defendant's guilt is overwhelming.

### 4. *Batson Claims*

Petitioner claims that the State peremptorily excused black veniremen solely upon the basis of their race in violation of the Fourteenth Amendment. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[11] The issue was raised at trial, but not upon direct appeal. The claim was reasserted in the state 3.850 proceeding, and as the basis for an ineffective assistance of appellate counsel challenge in the state collateral attack.

Two black prospective jurors were excused by peremptory challenges during jury selection.

■ The first juror, a Mr. Taylor, was backstruck after the state initially accepted him. Defense counsel objected under *State v. Neil,* 457 So.2d 481 (Fla.1984), a Florida Supreme Court decision that "preceded, foreshadowed, and exceeds the current federal [*Batson*] guarantees."[12] *See*

---

**10.** Petitioner has a due process right to the effective assistance of counsel on appeal where the state grants a first appeal as of right. *See Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

**11.** The claim under *Batson* is cognizable in this collateral attack as Petitioner's conviction was not final when *Batson* was decided. *See Teague,* 109 S.Ct. at 1067.

**12.** *Neil* provides the following test for improper bias in jury selection:

A party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and that there is a strong likelihood that they have been challenged solely because of their race.

*State v. Slappy,* 522 So.2d 18 (Fla.) *cert. denied,* 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). The trial court inquired of the State, and the prosecutors articulated the following reason for backstriking Mr. Taylor:

> [THE STATE] "Mr. Taylor was acceptable to the State but as the day wore on yesterday, it became obvious that Mr. Taylor was a very hostile individual. He became very angry at the notion that the Court may recall that he was not allowed to be—having already been questioned when your Honor dismissed people in the audience. He was vocally opposed to that, and since that time, he has not—he has been hostile, and the caused us to rethink our position with regard to Mr. Taylor."

R. at 1246. The trial judge noted that Mr. Taylor "did not in any way look hostile. He sat there quietly through the second day." R. 1247. Defense counsel argued that the State's reason was merely a "sham" and that the strike was racially motivated. The prosecutor responded that "I really fear hostile people on a jury and he appeared hostile." R. at 1499. The prosecutor added that the other member of the prosecution team made the same observations. The trial judge concluded that the record does not support the defense's claim of pretext, and stated that it was possible that the State "saw anger on [Taylor's] part." *Id.*

The State also struck a second black venireman Ms. Moss, who would have been the second alternate selected, if she had been seated. Since none of the venireman were called upon to replace any of the twelve jurors actually seated, there can be no possible prejudice to the defendant for failing to have Ms. Moss as a second alternate.

Since alternates are excused at the time the jury retires to consider its verdict and because they are instructed throughout the trial not to discuss the case or any of the facts of the case until finally retiring to consider their verdict, the voir dire selection of any alternate is totally immaterial in the final analysis unless, of course, the alternate actually replaces one of the twelve jurors. Since this did not happen in this case, it is immaterial as to whom the alternates were and whether or not they were black veniremen.

In any event, the Court will fully consider the arguments advanced by Petitioner. The claim fails on its merits under *Batson.* Defense counsel again asserted a *Neil* argument. The State advanced the following non-discriminatory reasons for the strike:

> [THE STATE] "Ms. Moss is a young, unemployed, single female which are my basic reasons for striking her. If you look, there are no young, unemployed, single persons whether male or female on the jury at this time.
>
> Ms. Moss was black. If she was white or green or yellow spots, I would not allow that person of that makeup to be on the jury if I can stop it."

R. at 1497.

*Batson v. Kentucky* was not available to the trial judge, as the decision post-dates the jury selection here by nearly a year. Under *Batson,* the Eleventh Circuit has held that "the striking of a single black juror for a racial reason is a violation of the Equal Protection Clause, *even where other black jurors are seated,* and even when there are valid reasons for the striking of some black jurors." *United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987) (emphasis added) *vacated in part on other grounds,* 836 F.2d 1312 (1988); *see United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986). The trial judge in the instant case accorded some weight to the fact that four of the fourteen jurors empaneled were black. Partially on that basis, the court ultimately found that blacks were not being "systematically" excluded from the jury. R. at 1497, 1499–1500.[13] It is possi-

457 So.2d at 486 (interpreting Florida Constitution).

**13.** It is clear from the record that the judge used the term "systematically" to describe the exclusion of blacks *in this case,* rather than as a reference to any pattern of prosecutorial conduct in other cases, in the sense of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d

ble that the trial judge may not have applied the precise constitutional standard which had evolved by the time Petitioner's conviction became final.

However, upon an independent review of the record under *Batson* and its progeny, this Court can discern no Equal Protection violation. First, Petitioner has not established a prima facie case of discrimination. Counsel must demonstrate that the circumstances surrounding peremptory strikes of members of a minority race raise an inference of discrimination. *See Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23. Nothing in the trial record warrants such an inference.

Even were the Court to assume a prima facie Equal Protection claim, the prosecution articulated racially-neutral grounds for its peremptory challenges which bore a relation to the case to be tried. *See Batson,* 476 U.S. at 97–98, 106 S.Ct. at 1723–24. Both jurors here were struck on the basis of the prosecutor's necessarily subjective evaluation of their demeanor and background. As the Eleventh Circuit has noted, "peremptory strikes are intended to give validity to ... conclusions which, while not sufficient to justify a for cause challenge, nonetheless raise the possibility of bias." *United States v. Williams,* 936 F.2d 1243, 1247 (11th Cir.1991) *reh'g denied, en banc,* 948 F.2d 729, *cert. denied,* —— U.S. ——, 112 S.Ct. 1279, 117 L.Ed.2d 504 (1992). The *Williams* court's insightful observation is equally applicable to this record: "[u]nless peremptory strikes are to be eliminated entirely, it cannot be concluded that the facts in this case clearly demonstrate the improper use of the peremptory privilege." *Id.*

759 (1965). The trial judge plainly was considering whether other blacks had been challenged in determining if the prosecutor's disputed challenges were based upon racial bias.

**14.** At a deposition taken shortly after the crime, Haines testified as follows:

[THE STATE]: Do you know a man by the name of Less McCullars?
[Haines]: Yes.
Q: Who is Less?
A: My boyfriend.
Q: Do you know him by any other name?

As to Mr. Taylor, Petitioner argues that this Court should either find that Mr. Taylor's observed hostility was pretextual, or that the prosecution members lied about their observations. Neither finding is supported by this record. Similarly, there is no warrant for concluding that Ms. Moss was excused out of racial animus.

Petitioner's *Batson* claims lack merit. On this basis, the Court additionally finds that appellate counsel was not ineffective for failing to raise these issues on direct appeal.

### 5. Remaining Guilt Phase Claims

#### A. Use of Petitioner's Alias

Petitioner claims that the State's use at trial of Roberts' alias, Less McCullars, deprived him of his right to a trial by a jury that presumed he was innocent. Roberts used his alias after he violated the conditions of his parole for a prior offense in Maryland. He argues that State's occasional use of his alias at trial indicated to the jury that he was not "a law abiding citizen and should not be presumed innocent." Pet. at 84.

First, the Court notes that the claim is procedurally defaulted, as counsel failed to raise it on direct appeal. *See Roberts v. State,* 568 So.2d at 1261.

■ Second, appellate counsel was not ineffective for foregoing this issue. There is no substance to the claim. The record reflects that Roberts customarily used both names during the time period before the murder. Several witnesses at trial knew Roberts under his assumed name, and considered "Rick" to be a nickname. Indeed, his girlfriend, Rhonda Haines, was of the same impression.[14] Roberts' trial counsel

A: No, except Rick.
Q: Have you ever heard him use the name Rickey Bernard Roberts?
A: No.
Q: Have you ever heard anybody call him that?
A: No.
Q: Have you ever seen him receive any mail under that name?
A: No.
Q: Do you know why he uses the nickname Rick?
A: No.

addressed him in post-trial correspondence as "Less." Lange Letter of July 17, 1987.

The Court finds no error in the state's use of Roberts' alias at trial. *See Card v. Dugger,* 911 F.2d 1494, 1520 (11th Cir.1990) (appellate counsel not ineffective for failing to raise meritless issues); *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987) (likelihood of claim's success relevant to assessment of counsel's performance).

### B. Cross–Examination of State Witnesses on Prior Crimes and Pending Charges

Roberts claims that he was barred from cross-examining Rimondi about a pending grand theft charge, and from questioning Ward and Cebey about their prior convictions, in violation of the Confrontation Clause. Petitioner alleges that the State's witnesses had "motivation to lie or curry favor with the State by enhancing testimony" against Roberts. Pet. at 72.

The Florida Supreme Court held that these claims were not preserved for appellate review because the "bias or motive" argument raised on collateral attack was never presented to the trial court. *Roberts v. State,* 568 So.2d at 1255. The court consequently denied Roberts' claim of ineffective assistance of appellate counsel, stating: "[a]ppellate counsel's failure to raise a claim which was not preserved for appellate review and which does not present a fundamental error does not amount to a serious deficiency in performance." *Id.* at 1261.

Based on this procedural default, federal habeas corpus review is barred, absent a showing of cause and prejudice. *See Coleman v. Thompson,* 111 S.Ct. at 2563; *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Although constitutionally inadequate appellate counsel

may satisfy the cause prong, *see Carrier,* 477 U.S. 478, 491–92, 106 S.Ct. 2639, 2647–48, 91 L.Ed.2d 397 (1986) this Court agrees with the Florida Supreme Court that appellate counsel was not ineffective in this instance.[15]

Florida law requires that the specific legal argument or ground upon which an objection is based be presented to the trial court in order to preserve the issue for appellate review. *See Occhicone v. State,* 570 So.2d 902 (Fla.1990) *cert. denied,* — U.S. —, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991); *Bertolotti v. Dugger,* 514 So.2d 1095 (Fla.1987); *Murray v. State,* 491 So.2d 1120 (Fla.1986); *Barclay v. State,* 470 So.2d 691 (Fla.1985). Appellate counsel cannot be considered ineffective because he failed to raise barred claims in the Florida Supreme Court. It was as clear to appellate counsel as it was to the Florida Supreme Court that trial counsel failed to object to the evidentiary rulings on appropriate grounds.[16] The decision to forego a claim that has "little chance of success" does not amount to ineffective assistance of counsel. *Smith v. Murray,* 477 U.S. 527, 534, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986) ("Our cases ... leave no doubt that a deliberate, tactical decision not to pursue a particular claim [on appeal] is the very antithesis of the kind of circumstances that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly disposition of its criminal cases"). Sacrificing weaker claims in order to focus on those more likely to prevail is not "evidence of incompetence," but rather is "the hallmark of effective appellate advocacy." *Id.* at 536, 106 S.Ct. at 2667. Nor may counsel's underestimation of the claim's merits serve to avoid the procedural bar. As the *Smith* Court noted, "the mere fact that counsel

Q: Did that ever seem to make sense to you the fact that his name was Less and he used the nickname Rick?
A: Not really.
Haines Depos. at 2–3 (June 26, 1984).

**15.** No presumption of correctness attaches to the state court's determination of this claim. The Eleventh Circuit has consistently held that ineffective assistance of counsel is a mixed question of law and fact, subject to *de novo* review

in federal habeas corpus proceedings. *See Cunningham v. Zant,* 928 F.2d 1006, 1016 (11th Cir.1991); *Thomas v. Kemp,* 796 F.2d 1322, 1324, *cert. denied,* 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986).

**16.** Of course, this habeas Court may not review the trial court's application of state evidentiary law. *Estelle v. McGuire,* — U.S. —, —, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Id.* at 535, 106 S.Ct. at 2666–67.

■ Therefore, the Court finds that petitioner may not overcome the procedural bar to review of this claim. The Court further finds that the exclusion of impeachment evidence of prior crimes, if such exclusion was error, did not result in a fundamental miscarriage of justice. The prior conviction evidence excluded was not of a kind that would undermine the accuracy of the guilt determination here. It cannot be said that the exclusion of this evidence "probably" resulted in one who is "actually innocent." *Carrier*, 477 U.S. at 495–96, 106 S.Ct. at 2649–50; *Johnson*, 938 F.2d at 1175.

## C. Absence of Defendant

Petitioner alleges that he was absent from "critical stages" of his trial, and that the failure to assure his presence amounts to a constitutional violation. Pet. at 257. Defense counsel's customary announcement that the defendant was in attendance is absent from the record of two pretrial hearings on various motions. Additionally, as set out in Part III B.1 above, Roberts was not present for a jury view of the crime scene during their deliberations. On direct appeal, the Supreme Court of Florida assumed *arguendo* that Roberts was in fact absent from the pretrial hearings, and conducted a detailed review of the motions heard on those occasions. *Roberts*, 510 So.2d at 890–91. The court concluded that no prejudice to the defendant could have resulted, because "each of the motions heard during these sessions involved matters in which Roberts, if present, could not have assisted in arguing." *Id.* at 891. As to the jury view, the court found an express waiver of the defendant's presence, and further concluded that the fairness of the proceeding was not thwarted by such absence because no evidence or testimony could have been presented at the view. *Id.* at 890.

Upon independent review, this Court finds that Petitioner's claim is without merit.

■ A defendant has a due process right to be present at his trial "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The absence of the defendant does not rise to the level of a constitutional violation "when [the defendant's] presence would be useless, or the benefit but a shadow." *Id.* 54 S.Ct. at 332. Relying on *Snyder*, the Supreme Court has more recently held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987).

■ Petitioner's presence at either the hearings or the jury view would not have been useful in ensuring a more reliable determination of any of the matters at issue. The pretrial hearings involved legal argument; no evidence was presented. There is no constitutional right to be present at such hearings. *See In Re Shriner*, 735 F.2d 1236, 1241 (11th Cir.1984). The Court has already concluded that Petitioner was not prejudiced by his absence from the jury view. *See Part* III B.1, *supra*. The attorneys could not speak at all to the jurors, nor could the jurors speak among themselves. The scene was showed to the jury by court security officers. There was no constitutional infirmity in this procedure. *See Snyder*, 291 U.S. at 113, 54 S.Ct. at 335 (finding no due process violation where court prohibited defendant from attending jury view of murder scene, noting "[w]e do not see what good the presence of the prisoner would do, as he could neither ask nor answer questions, nor in any way interfere with the acts, observations or conclusions of the jury") (quotations and citations omitted) (Cardozo, J).

## IV. SENTENCING PHASE CLAIMS

### 1. *Ineffective Assistance of Counsel in Presentation of Mitigating Evidence*

Petitioner claims that he received ineffective assistance of counsel at the penalty phase of his trial. Roberts argues that his trial counsel, Kenneth Lange, failed to: (1) provide adequate background information to and otherwise prepare three mental health experts called at trial; (2) present evidence of Roberts' drug and alcohol use on the day of the crime; and (3) present nonstatutory mitigating evidence by calling any of Roberts' family members.

Petitioner's argument begins with Roberts' original counsel's withdrawal from the representation. Thomas E. Scott was appointed to represent Roberts, but withdrew due to a conflict in January 1985, R. at 105–07, after preparing a substantial part of the Roberts' penalty phase presentation. Roberts was then briefly represented by two interim attorneys before trial counsel Lange took the case approximately nine months before trial, on March 6, 1985. R. at 225–26. The argument is not that Lange was incompetent due to inexperience. He was a state prosecutor for five years, and prosecuted major crimes for the last three of those years. Rather, Petitioner contends that Lange "totally ignored" the penalty phase of the trial. Trans. of Pet.'s Closing at 34. Petitioner contends that Lange relied entirely upon the work of his predecessor counsel Thomas E. Scott, and failed to himself investigate and prepare an effective penalty phase presentation.

At the evidentiary hearing in this Court, Lange explained that "I had given everything I had in the guilt and innocence phase and frankly I ran out of gas is the simplest way I can explain it." Lange Test. at 65. When asked by the Court to clarify his statement, Lange stated:

When [the verdict] came back guilty of first degree murder, we had to proceed fairly promptly into a death phase and I had my three doctors who were going to testify about the organic brain damage and I frankly had not—I hadn't anticipated a guilty verdict on a first degree murder case. So I didn't go beyond my pre-trial preparation, I didn't go beyond preparing those three mental health experts for a possible death phase.

I didn't get into the business about other family members who could be available to talk about the history of him coming from a dysfunctional family or abusive parent or alcohol or drug abuse history. I didn't do that because frankly I was devoting all my attention to the guilt innocence phase and that's what I did.

*Id.* at 66. On this basis, Petitioner argues that his counsel failed to establish statutory mitigation, and to introduce available nonstatutory mitigation evidence.

The trial court denied Roberts' 3.850 motion to vacate without holding an evidentiary hearing, finding that Roberts had not been prejudiced by the alleged attorney errors.[17] The Florida Supreme Court affirmed, noting that "[t]he record supports the trial court's conclusion that Roberts was not prejudiced by the alleged deficient performance and therefore was conclusively entitled to no relief in connection with those claims." *Roberts*, 568 So.2d at 1260.

As this claim was actually litigated in the state court, it is now before this Court for an independent review on the merits.

The two-pronged *Strickland* standard applies to claims of ineffectiveness of counsel at the sentencing phase. As to the prejudice prong, the Supreme Court has held that when "a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate

---

**17.** In denying 3.850 relief, the trial court stated: Seems to me that the doctors involved in this case and of the testimony before me, that these doctors did a very good job in examining this defendant and contacting those peo- ple of the family they thought were important and they testified here at length before this court and before the jury as to his background, as to his mental condition. The jury heard it all. Jury heard every bit of it.

court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

The Eleventh Circuit has explained the performance prong as to presentation of mitigating evidence as follows:

> In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. After a sufficient investigation, however, counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.

*Cunningham,* 928 F.2d at 1016 (quoting *Card v. Dugger,* 911 F.2d 1494, 1509 (11th Cir.1990) (quotations and citations omitted); *see Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987) *reh'g denied, en banc* 835 F.2d 291, *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988).

 Viewing the record in this case against this legal standard, this Court finds no deficiency in counsel's penalty phase performance.

At the evidentiary hearing in this Court, Lange testified that he did little to supplement the efforts of prior counsel Thomas Scott in preparing the penalty phase. Because Lange "ran out of gas," he did not explore all of the possible mitigating evidence. Petitioner contends that Lange presented the mental health experts "not because he had thought about it but merely because they were there and had been given some information by [former counsel] Scott." Trans. of Pet.'s closing at 50. However, the relevant inquiry is not whether Lange developed and prepared a penalty phase presentation by his own hand. *See United States v. Hall,* 843 F.2d 408, 412 (10th Cir.1988) (replacement counsel who presented satisfactory case at trial not ineffective for failing to meet with client before trial, where original attorney had already substantially prepared the case, and

then cooperated with replacement counsel). The analysis does not turn on whether Lange was "tired." *Messer v. Florida,* 834 F.2d 890, 897 (11th Cir.1987) (as a "tired lawyer is not necessarily an ineffective lawyer," attorney error at trial must be shown) (quotations omitted). Instead, the focus must be on what the sentencer *actually heard.* Trial counsel is not ineffective if counsel in fact presented a satisfactory penalty phase case.

Therefore, the Court now turns to the evidence actually presented at trial. The Court concludes that trial counsel was not incompetent for relying on another highly competent trial lawyer's thorough preparation.

Petitioner called three mental health experts at trial to establish mitigation.

The first witness called was Dr. Jeffrey W. Toomer, an expert in forensic psychology. Dr. Toomer met with Roberts on three occasions prior to trial. His first step was to construct a "psychosocial history" of Roberts from "birth up to the present day," by interviewing the petitioner, his mother, and his uncle. R. at 3315–19. Dr. Toomer also gathered and studied the records from Roberts' prior incarceration, his medical history, school records, and police reports. He testified to the content of these records at trial, and, over objection, presented a narrative of Roberts' life— from a hernia operation at age three to his involvement with drugs, move to Miami and indictment for murder. Dr. Toomer related the circumstances of Roberts' upbringing, and his educational and employment history. Dr. Toomer also administered a battery of personality and intelligence tests. On the basis of this information, he concluded that Roberts suffered from an "organic brain disturbance." R. at 3325. Dr. Toomer explained that the condition is characterized by apparently normal behavior, but with the potential for "poor impulse control," "isolated amounts of antisocial behavior," and "explosiveness." R. at 3327–28. Dr. Toomer's evaluation of Roberts revealed that "he fits all of the characteristics in terms of symptomatology." R. at 3328. Defense counsel's ques-

tioning rebutted the state's cross-examination of the witness, which attempted to portray Roberts as a sociopath:

Q. So the person as you described Mr. Roberts having the organic brain syndrome with these periodic or occasions of violent outbursts, impulses, ability to control their outbursts, is that a disorder that any person could have, of course, a job, for example?

A. By all means yes.

Q. And function on the surface as a normal quote appearing person unquote?

A. Exactly, exactly.

Q. And have the capacity to do that type of violence?

A. By all means, yes.

R. at 3352.

Dr. Arthur Stillman, a forensic psychiatrist, met with Roberts three times before trial. He presented a detailed explanation of the pathology of organic brain syndrome and its manifestations. Like Dr. Toomer, he concluded that Roberts was brain damaged, and unable to control his rage reactions on occasion. Dr. Stillman testified as length about the effect of drug and alcohol on a person in Roberts' condition, stating that "a brain damaged person who uses substances has the tendency for the substance to have four or five, or six or ten times the affect that it would have on a normal brain, meaning that it would severely aggravate whatever proclivities were in that program." R. at 3365. He agreed that Roberts' organic brain disorder, coupled with his extensive history of drug and alcohol abuse, would lead to poor impulse control. R. at 3374. Dr. Stillman testified that Roberts' violent actions on the night of the crime were triggered by substance use, but that such effects were only temporary:

Q. The isolated, explosive antisocial conduct like a rape, like murder, a violent crime, would be a result of the involuntary action of a person because of the brain damage?

A. Yes. It goes beyond his ability, beyond his ability to control ones self based on several properties. It's like igniting a match. When it's ignited you can't put it out until it burns out.

\* \* \* \* \* \*

From the history of this case, it appears in a number of places that having committed—allegedly committed an offense and an allegation that he drove this victim home, that seems to be something peculiar for somebody to do that.

From the point of view of the offense, if, if, indeed the offense occurred, *the effects of the substance wore off and the violence seems to have subsided.*

R. at 3377.

On cross-examination, Dr. Stillman was asked what evidence indicated to him that Roberts was under the influence of drugs or alcohol at the time he committed the crime. Dr. Stillman responded that Roberts "has had a similar history repeatedly." R. at 3399. He stated that detoxification was the "one explanation that I could fathom" for Roberts' driving the victim home after undergoing a rage reaction. R. at 3400.

Finally, Dr. Barry Crown, a neuropsychologist, testified for Roberts. Dr. Stillman referred Roberts to Dr. Crown for further testing to confirm a diagnosis of organic brain damage. Dr. Crown testified that he performed a "limited technician function," as he was only asked "to address the issue of brain function." R. at 3422–23. He stated that Roberts was referred to him to perform a specific procedure, in the same way a physician might refer a patient for x-rays or lab work. On the basis of a number of neuropsychological tests, Dr. Crown reached the same conclusion as Drs. Toomer and Stillman about brain damage. Although unable to locate the specific lesion site, Dr. Crown testified that Roberts' brain damage was located toward the back of his head, and caused "functional weakness."

At the evidentiary hearing in this Court, Drs. Toomer and Dr. Crown testified,[18] as well as another mental health expert retained by collateral counsel, Dr. Henry

18. Dr. Stillman had since passed away.

Dee. Each of these doctors again confirmed the diagnosis of organic brain damage presented to the penalty phase jury. Drs. Toomer and Stillman indicated that additional information about Roberts' upbringing and drug and alcohol use on the night of the offense would have corroborated and substantiated their medical conclusion. These experts, however, did not state that additional information would have *changed* the diagnosis in any meaningful way. There was no indication that the experts felt incapable of basing their conclusions on the information they obtained through their own testing, interviews and examinations.

The Court finds that Roberts' theory of statutory mitigation was in fact presented to the jury by defense counsel. Petitioner attempted to establish two mitigating factors: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. *See* Fla.Stat. § 921.141(6)(b & f). Defense counsel presented compelling evidence of Petitioner's brain damage through the mental health experts at trial. Defense counsel portrayed Roberts as a "normal" person who experienced sudden, uncontrollable episodes of violence. The experts also testified to the potential "triggering" and "exacerbating" propensities of substance use on a person in Roberts' condition. The import of this evidence as it relates to statutory mitigation is plain,[19] and trial counsel argued it to the jury [20] and the judge [21].

The fact that the jury did recommend death—and that the judge did not find any mitigating factors—does not mean the counsel was constitutionally inadequate. The professional errors alleged here parallel petitioner's argument in *Card*, 911 F.2d at 1511. In that case, petitioner Card claimed that his trial counsel failed to provide appointed mental health experts with

---

**19.** Petitioner draws an analogy to *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir.1991). In that case, the court held counsel's penalty phase performance deficient for, *inter alia*, failing to develop and present evidence of a prior serious head injury suffered by the defendant. Cunningham had a steel plate implanted in his head after a near-fatal car accident which resulted in extremely *painful and debilitating headaches*. Trial counsel called two witnesses who mentioned the skull fracture "only in passing." *Id.* at 1018. Counsel did not refer to the head injury in closing, "thereby failing to place this evidence squarely in front of the jury." *Id.* Although a neurosurgeon was consulted in connection with a possible insanity defense, counsel presented no medical penalty phase testimony.

In contrast, the nature and extent of Roberts' brain injury was exhaustively explained to the jury by mental health experts. As noted, the fact that organic brain syndrome results in uncontrollable rage reactions, intensified by substance use, was the primary focus of Roberts' penalty phase presentation. This is not a case where, as in *Cunningham*, counsel left the jury without guidance to puzzle over the possible consequences of a medical problem and its relation to statutory mitigation. Petitioner's theory that organic brain damage, possibly coupled with substance use, resulted in a severe "mental or emotional disturbance" and/or a substantial impairment of Roberts' "capacity to conform his conduct to the requirement of law" was in evidence and argued to the sentencer. The connection between the medical diagnosis and statutory mitigation was clear.

**20.** Defense counsel argued statutory mitigation at length to the sentencing jury. For example, Lange questioned whether a person like Roberts should "get the chair," arguing:

Is that a person with that kind of longstanding, documented history where three doctors who said he has chronic brain damage, chronic alcohol and drug abuse which has exacerbated his brain damage, a person who has these unfortunate periodic involuntary explosions, because of what? Because of the brain damage.

R. at 3485–86.

**21.** After the jury recommended the death penalty, the trial court heard argument from counsel on sentencing. Lange argued:

I think the record is clear, Judge, without contradiction, that he was organically brain damaged. He did have a long history of alcohol and drug abuse; that is absolutely frequent for this kind of person to have these unfortunate periodic, short term, isolated explosive disorders of conduct.... I think at the time of this incident, it is clear, without any doctors to rebut it, that Rickey Roberts had a substantially diminished capacity, and I think the evidence from the three doctors is massive to that effect.

R. at 3530–31.

background material that would have supported a diagnosis of organic brain damage. The Eleventh Circuit noted that the experts had no difficulty in basing their conclusions on information they derived from independent testing. *Id.* at 1512. Moreover, it was "unclear" to the court that the psychiatric evaluations would have changed had the material been provided to the experts. *Id.* The Court concluded: "The fact that [the mental health expert's] assessment was not sufficient to cause the jury to recommend a life sentence or to cause the judge to find the presence of mitigating factors does not mean that counsel was ineffective." *Id.* at 1513; *see also Fleming v. Kemp,* 748 F.2d 1435, 1452 (11th Cir.1984) ("[a] defense attorney is not ineffective solely because his client is sentenced to death"), *reh'g denied, en banc,* 765 F.2d 1123 (11th Cir.1985). Based on the evidence and argument that the sentencer actually heard at the penalty phase, defense counsel's performance was not deficient.

■ Petitioner also claims that Lange was ineffective for failing to present evidence of Roberts' drug and alcohol use on the day of the crime. The fact that such evidence was not presented cannot be attributed to a failure to investigate or lack of knowledge on the part of defense counsel. Lange filed a successful motion *in limine* to suppress any testimony regarding Roberts drug use. In the motion, Lange stated that, "[s]everal State's witnesses (Rhonda Haines, Tom McMurray, Jimmy Oliver, Sean Brown, Kevin Brown, James Horan, Gregory Mendus) have testified during the deposition that the accused at various times prior to the alleged incident either talked about taking drugs or took drugs. None of these collateral acts occurred during the actual incident (or alleged to have occurred) that underlies this

case." R. at 291–92. If defense counsel had decided to present evidence of substance abuse on the day of the crime, he was certainly aware that a wealth of it existed. Our Circuit has held that "[a]fter a sufficient investigation … counsel may make a reasonable strategic judgment not to present less than all possible available evidence in mitigation." *Cunningham,* 928 F.2d at 1006 (citations and quotations omitted). Counsel had developed such evidence in this case, but chose not to present it. Indeed, he deemed it strategically important to keep Roberts' substance abuse from the jury's consideration.

This Court cannot label Lange's failure to present substance use evidence at the penalty phase unreasonable. Roberts' claim of innocence would have been incompatible with evidence of substance abuse and intoxication on the night of the crime. Lange attempted to portray Roberts as "normal" and "clean" during the guilt phase. Putting on extensive evidence of substance abuse—and especially of heavy use just before the crime was committed—would have damaged credibility with the jury and tended to erase any lingering doubts of Roberts' innocence. Lange was manifestly aware of the jury's doubts,[22] and would have been careful to avoid jeopardizing any remaining jury uncertainty. Counsel is not ineffective for pursuing such a strategy. *See Stewart v. Dugger,* 877 F.2d 851, 856 (11th Cir.1989) (counsel not ineffective for focusing on lingering doubt and omitting character witnesses, thus making "a strategic decision that in light of the atrocious nature of the offense, [defendant's] only chance of avoiding the death penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury"), *cert. denied,* 495 U.S. 962, 110 S.Ct.

---

**22.** The first issue Lange argued in his closing to the trial judge at sentencing was lingering doubt shown by the jury's lengthy deliberation:

I think the [jury's long deliberation] is important because even though close is only valid in horse shoes, it certainly was a case where if the jury ultimately concluded they did not have a reasonable doubt on the murder, the certainly had doubts.

Now, whether they ultimately resolved them, and obviously resolved them as not being reasonable doubts, they had some serious doubts the kept them in there talking, without a question, without a question for 21 hours.

R. at 3518–19.

2575, 109 L.Ed.2d 757 (1990). The Eleventh Circuit has recognized the impact that lingering doubt may have on a penalty phase jury. *See id.* (citing cases). The fact that the jury reached a verdict only after nearly 23 hours of deliberations tends to validate Lange's approach.

 Finally, counsel was not ineffective for presenting nonstatutory mitigation through mental health experts rather than family members. Dr. Toomer contacted Roberts' mother and uncle, and interviewed the defendant. He presented the circumstances of Roberts' upbringing at the penalty phase, and related Roberts' childhood to the diagnosis of brain damage. At the evidentiary hearing in this Court, defense counsel did not offer a tactical reason for not presenting testimony of family members. Lange recalled that "[t]here may have been one or more phone contacts" with Roberts' family. Lange Test. at 65. He did not call them to testify at the penalty phase, however, because he "just ran out of gas." *Id.*

Unless this Court were to find a *per se* Sixth Amendment requirement that penalty phase counsel *must* present family member testimony, Lange's performance cannot be considered deficient. Lange presented the jury with evidence of Roberts' troubled childhood through Dr. Toomer. Dr. Toomer's conclusion was consistent with a "normal" person who experienced episodes of rage, and contradicted the state's theory that Roberts was a malicious sociopath. The sentencer could have concluded that Roberts was deserving of mercy, both because of his family circumstances and his medical condition. *See Card*, 911 F.2d at 1511 (failure to call family members who might have provided a "humanizing portrait" of defendant not ineffective where mental health expert provided "generalized, skeletal account" of defendant's upbringing). The fact that Lange was unable six years later to articulate a tactical reason for taking this approach does not detract from its validity and impact. There is no Sixth Amendment obligation on counsel to present all possible evidence of nonstat-

utory mitigation, in the manner that collateral counsel deems most effective.

In any event, assuming *arguendo* that Lange's performance was deficient, which the Court does not, the Court finds that no prejudice resulted from trial counsel's actions.

The federal evidentiary habeas hearing adduced oral testimony and written affidavits of Roberts' family members, establishing that the defendant had been abandoned by his mother when he and his brother were children, to be raised by grandparents. The grandparents were religious people who provided a home and the amenities of a family of average financial circumstances in the small town where they lived. The defendant's cousins, also grandchildren of the defendant's grandmother and grandfather, lived nearby with their father and mother (the daughter of defendant's grandparents).

The defendant frequently visited in this home of his aunt and uncle and grew up playing with his cousins. After the death of his grandmother, his grandfather grew more withdrawn and short tempered with the children. Although they arrived home from school before the grandfather arrived home from work, the defendant was free to play in the yard of the home, watch television, or help himself to food from the refrigerator. The defendant's grandfather did not punish the boys beyond a switching when they did not perform their assigned household chores.

Each summer the defendant, his brother, his cousins and other relatives had the opportunity of going to live on another relative's cotton and tobacco farm. This got the children out of the small town in which they lived to what appears to have been a healthy outdoor farming atmosphere. During the summers all of the children were expected to work on the farm and contribute to helping with the farm chores.

The family members testifying in the federal habeas hearing all said that the defendant, as a child, missed his mother terribly. He talked about going to live with her and on one occasion apparently went down to the bus station to try to find

a way to catch a bus to go find his mother. Although this episode of the defendant's life is tragically sad, it is no different from that of the childhoods of thousands of people who grow up without a father, mother or either parent.

Upon considering this testimony, the Court concludes that the defendant had, but for the longing of missing his mother, a relatively happy childhood.

After considering all of the testimony, the Court concludes that the result of the penalty phase proceeding would not have been different if this additional nonstatutory mitigating evidence were introduced. Thus, even if Dr. Toomer's description of Roberts' life had been supplemented by family members' anecdotal information, the result of the sentencing would not have been different.

2. *Trial Court's Findings of No Mitigating Circumstances*

Petitioner argues that the trial court's "refusal" to find any mitigating circumstances was clearly erroneous, and resulted in the arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment. *See Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Petitioner points to the expert testimony concerning Roberts' brain damage and substance abuse, claiming that this evidence established two statutory mitigating factors: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. *See* Fla.Stat. § 921.141(6)(b & f).

The trial court entered its 17-page "Findings in support of death sentence" on December 31, 1985. R. at 588. The trial judge stated that he had "considered each and every statutory mitigating circumstance and any other conceivable mitigating factor." The findings contain a review of the evidence that would support each mitigating circumstance enumerated in Fla. Stat. § 921.141. The court ultimately

found no mitigating circumstances. The findings specifically rejected the two factors set out above, concluding that:

> There is no testimony in this record, from any witness, that the defendant was exhibiting any of the behavioral characteristics at the time of the murder, which would support or corroborate the bald assertions of the existence of an extreme emotional or mental disturbance.

The Court feels that the evidence in this record is that the defendant is a sociopath who can commit crimes with no care for the victims. This is evidenced by the testimony of the Sexual Battery victim as to the defendant's attitude and demeanor after the murder. There is and was not one shred of caring or mercy for George Napoles by Rickey Roberts after the beating. The defendant could have summoned aid, even anonymously, once he was away from the scene, but he did not. This is further evidenced by a review of the defendant's prison, school, psychological and psychiatric records. These records tell this Court that the defendant has an antisocial personality and *not* brain damage.

The Court has had ample opportunity to observe the defendant, both visually and verbally during 3 weeks of the trial of this case. The Court noted that the defendant took the stand witness stand on his own behalf. He gave an articulate story as to his whereabouts the night and morning of the murder. He denied any participation in the killing and was able to articulate answers in response to cross-examination of the prosecutor. *The defendant exhibited to this Court absolutely no evidence of any mental infirmity that could in any way qualify as a mitigating circumstance.* On the contrary the defendant impressed the Court as having average intelligence, ability to reason and express himself and the ability to function as a normal rational human being.

R. at 594–95 (emphasis added). The court considered the mental health experts' testi-

mony in detail, and determined that statutory mitigation had not been established.[23]

The Florida Supreme Court found no abuse of the trial court's discretion, noting that the judge may accept or reject the testimony of an expert witness just as he may reject the testimony of any other witness. *Roberts*, 510 So.2d at 894.

■ The factual determinations of the trial court and the Florida Supreme Court are entitled to a statutory presumption of correctness under 28 U.S.C. § 2254(d). *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). The statute provides in relevant part:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court, *a determination after a hearing on the merits of a factual issue*, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct. . . .*

28 U.S.C. § 2254(d) (emphasis added). In the absence of one of seven exceptions to the provision,[24] and if the habeas court concludes that the state court determination is "fairly supported by the record," the burden then rests upon the petitioner whose case has "run the entire gamut of a state judicial system, to establish by convincing evidence that the factual determination by the state court was erroneous." *Mata*, 449 U.S. at 550, 551, 101 S.Ct. at 771 (quotations omitted); *see generally Martin v. Dugger*, 686 F.Supp. 1523, 1551–57 (S.D.Fla.1988) (discussing application and policy § 2254 presumption of correctness doctrine) (King, C.J.); *White v. Wainwright*, 632 F.Supp. 1140, 1150–52 (S.D.Fla. 1986) (same).

■ The Supreme Court has held that a federal habeas court must more than "simply disagree with the state court before rejecting its factual determinations." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983). The habeas court must conclude that those determinations "lacked even 'fair support' in the record." *Id.*

■ Based on an independent review of the record, the Court concludes that the state court factual determination is fairly supported. Indeed, there is *no* evidence to support the contention that Petitioner was undergoing an extreme mental or emotional disturbance, or that his capacity to conform his conduct to the requirements of law was substantially impaired *at the time of the offense.*

Petitioner testified at trial to normal, rational behavior during the entire course of the evening, from his dealings with others he met on Key Biscayne to his interaction with the hitchhiking Michelle Rimondi. Rimondi's testimony about Roberts' actions is inconsistent with a sudden, explosive rage reaction. Rimondi testified that Petitioner impersonated a beach patrol officer, requesting identification and an explanation for Rimondi's and Napoles' presence at the beach. After Napoles became suspicious, Roberts walked to his own car with Napoles to check Roberts' identification. Roberts then removed a bat from his car, took Napoles by the arm, and walked him back to Napoles' car. Roberts ordered Napoles to assume the frisk position, directed Rimondi to turn around, and then beat Napoles to death. To avoid detection, Roberts backed his car further down the beach, and raped Rimondi. He later returned to the scene when he realized he had forgotten his wallet. Rimondi's testimony comports with a calculated killing rather than an uncontrollable rage reaction. Nothing in

---

**23.** The trial court's written findings preclude any claim under *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The trial judge was aware that he could *consider* all evidence of mitigation, and in fact did so.

**24.** Petitioner does not allege that any of the exceptions to § 2254(d) are applicable. Upon independent review of the record, the Court determines that Petitioner may not avail of any of these exceptions. The merits of this factual dispute were adequately developed at a full and fair hearing in state court.

either Petitioner's or the rape victim's version of the events demonstrates a mental state that would support—much less convincingly establish—the two statutory mitigating factors urged by Petitioner.. Thus, even if the trial court had fully credited the mental health expert's testimony, there is no record evidence of statutory mitigation when the crime was committed. Unless this Court refuses to credit the testimony of the two principal witnesses at trial, and the trial judge's factual findings, Petitioner's claim must be rejected.

In any event, the trial judge is not bound to accept the testimony of experts, even where the state offers no evidence in rebuttal. The trial court may evaluate the *weight* of such evidence in the same way it would evaluate the testimony of any other witness. The court here provided detailed reasons for declining to accept some aspects of the experts' testimony. The presumption of correctness is not removed where the trial court relies on witness firsthand observations and the judge's own impression of the defendant's demeanor, rather the opinions of mental health experts. It follows that the additional mental health opinions provided at a subsequent evidentiary hearing also do not overcome the presumption.

Petitioner cites *Magwood v. Smith*, 791 F.2d 1438 (11th Cir.1986), for the proposition that a federal habeas court may review a state court factual finding concerning the existence of mitigating circumstance. In that case, the trial judge rejected two mitigating circumstances relating to Magwood's diminished mental condition at the time the defendant murdered a sheriff. The trial court ignored all psychiatric evidence, including the findings of a three-member court appointed "lunacy commission" that reported that Magwood was presently insane and probably insane on the date of the murder. The Eleventh Circuit held that "the record clearly demonstrates that Magwood killed [the sheriff] under the influence of extreme mental or emotional disturbance." *Id.* at 1450.

In contrast to *Magwood,* the record here adequately supports the state court determination of Petitioner's mental state when the crime was committed. As noted, neither Roberts' nor Rimondi's testimony supports either mitigating circumstance. Unlike *Magwood,* the expert testimony does not *establish* Roberts' diminished capacity at the time of the offense. At most, the mental health testimony here demonstrates that Roberts suffered from a medical condition that is associated with poor impulse control, with the resultant potential for uncontrollable violence. The trial judge here did not ignore this evidence—he determined that neither statutory mitigating circumstance applied based on the total picture of the crime presented at trial and observations of the defendant's demeanor. Unlike the *Magwood* court, this Court is unable to conclude that the state court's factual determination lacks fair support in the record.

Further, the Court notes that the holding of *Magwood* may be have been limited by the Supreme Court's intervening decision in *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606, *reh'g denied,* —— U.S. ——, 111 S.Ct. 14, 111 L.Ed.2d 829 (1990). The Supreme Court there applied the sufficiency of evidence standard established in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to findings of *aggravating* circumstances: "A state court's finding of an aggravating circumstance in a particular case ... is arbitrary and capricious if and only if no reasonable sentencer could have so concluded." *Jeffers,* 110 S.Ct. at 3103. In determining whether a state court properly found the existence of a factor, federal habeas courts are not permitted "to peer majestically over the state court's shoulder so that they might second-guess its interpretation of facts that quite reasonable—perhaps even quite plainly—fit within the statutory language." *Id.* at 3102 (quotations and citations omitted). The Court recognized that a finding of an aggravating circumstance often requires a sentencer "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 3103 (quoting *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789).

This Court can discern no reason that any different standard should apply to federal habeas review of the existence *vel non* of a *mitigating* circumstance. Therefore, the *Jeffers* standard even more strongly compels the rejection of Petitioner's claim here. It is clear that a rational sentencer could have found that no statutory mitigating factors apply in this case.

### 3. *Admission of Hearsay Statements of Victim of Prior Crime*

At the sentencing phase, the state called Coulbourn Dyne, the Chief of Police of Salisbury, Maryland, who investigated Roberts' 1974 rape of Brenda Lee Hardy. Chief Dyne recited the facts of the defendant's prior rape conviction, including certain hearsay statements of the victim. Although trial counsel timely objected to Dyne's testimony, appellate counsel did not bring a Confrontation Clause claim in the Florida Supreme Court. Petitioner now claims that this failure amounts to ineffective assistance of counsel.

The Florida Supreme Court rejected the ineffectiveness claim in the state habeas proceeding, holding that "even if it were error to admit [hearsay testimony of the victim's account of the crime], the same basic facts were related to the jury during the officer's testimony concerning Roberts' confession of the crime." *Roberts*, 568 So.2d at 1262. The Florida Supreme Court therefore concluded that any error would have been found harmless if the claim had been brought on direct appeal.

■ Upon independent review, this Court agrees with the state court determination of this issue. Roberts provided the same information related by Chief Dyne in a handwritten voluntary statement dated November 19, 1974. In that confession, Roberts stated that he hit the victim, pushed her down on a bed, and raped her. He confessed to stabbing the victim in the back twice with a pair of scissors after she

hit Roberts in the head with a glass. Chief Dyne specifically relied on this confession in describing the actual commission of the crime. Chief Dyne did not relate any significant facts concerning the crime that were not disclosed in Roberts' own statements, or found by the trial judge in adjudicating Roberts guilty of rape and assault with intent to murder.[25] Counsel's performance was not deficient for omitting this issue on direct appeal.

The Court additionally finds that Roberts was not prejudiced by admission of the hearsay testimony. Chief Dyne contacted the victim, but she refused to testify at the instant trial. Chief Dyne explained:

[The victim] just said she never got over the assault. She fell apart when she found that Rickey had been released from prison.

She thought he was in forever and she found out he was out and she was just lost, was hysterical, just about, and I had to go call her at home giving her a couple of days to settle down.

She just said she did not want to come. She said she couldn't face it again.

R. at 3303. Petitioner stood to gain little, if anything, from subjecting Brenda Lee Hardy to reliving the horror of her rape by requiring her to be cross examined on the details of the crime. Indeed, her first-hand account of the rape and stabbing would doubtless have been more damaging than Chief Dyne's version of the events.

### 4. *Hitchcock Claim*

Petitioner argues that the trial court improperly limited the testimony of one of the defense's mental health experts at the sentencing phase. In the course of answering a direct examination question, Dr. Stillman stated that Roberts' former counsel "wrote me a letter and wrote an interesting commentary." The trial court sustained the state's objection to the doctor's testimony about the letter. Petitioner alleges that

---

**25.** Roberts waived his right to a jury trial. The case was tried to a judge who at sentencing stated to Roberts: "This case is just about as bad a case as I have heard of. You didn't even know this girl, you went to her apartment, you forced your way in, you beat her, you raped her,

and then in an obvious attempt to kill her so that she would never be able to tell on you, you stabbed her five times with a pair of scissors. It is just by the grace of God that she is not dead today." Trans. of *Maryland v. Roberts*, No. 8127 (Apr. 10, 1975).

the court's ruling prevented the introduction of nonstatutory mitigating evidence in violation of *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

The Florida Supreme Court found that Petitioner failed to raise this claim on direct appeal, and held that it was procedurally barred. *Roberts,* 568 So.2d at 1257–58. Petitioner cannot meet the cause and actual prejudice standard for this failure. *See Coleman,* — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).[26]

5. *Jury Instructions at Sentencing Phase*

Each of Petitioner's challenges to the penalty phase jury instructions lack merit.

■ A. *"Especially Heinous, Atrocious or Cruel."* Petitioner claims that the trial courts instruction on Florida's "especially heinous, atrocious, or cruel" aggravator was not constitutionally limited or channelled in violation of *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In that case, the Supreme Court held that Oklahoma's jury charge, identical in wording to Florida's charge, left the jury unchanneled discretion to make an arbitrary and capricious decision. The Court has also found constitutional error in Mississippi's "especially heinous" charge. *See Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 1451 n. 1, 108 L.Ed.2d 725 (1990) (Blackmun, J., concurring and dissenting); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) *(per curiam ).*[27]

The Florida Supreme Court held this claim to be procedurally barred for failure to bring it on direct appeal. *Roberts,* 568 So.2d at 1257–58. Petitioner cannot show cause and prejudice in this Court for the procedural lapse. No factor external to the defense impeded counsel's efforts to construct or raise the issue. *See Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 2647–48, 91 L.Ed.2d 397 (1986). The legal basis of the claim was reasonably available to counsel. *See Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (holding Georgia's jury charge on "outrageously or wantonly vile, horrible and inhuman" aggravator unconstitutionally unlimited); *see also Stringer v. Black,* — U.S. —, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (for retroactivity purposes, *Maynard* in 1988 did not create new rule because *Godfrey* previously laid the foundation for this precise type of claim). Petitioner has not claimed that counsel was ineffective for failing to raise this claim.

■ Nor does this challenge fall within the fundamental "miscarriage of justice" exception to procedural bar. In cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," a habeas court has the equitable power to consider an issue notwithstanding the existence of a procedural bar. *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. The Supreme Court has also recognized that one may be actually innocent of the death penalty. *See Smith v. Murray,* 477 U.S. 527, 537–38, 106 S.Ct. 2661, 2667–68, 91 L.Ed.2d 434 (1986). The Eleventh Circuit has recently held that a petitioner makes a colorable showing that he or she is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates *all* of the statutory aggravating factors found to be present by the sentencing body. *See Johnson v. Singletary,* 938 F.2d 1166, 1183 (11th Cir.1991) *(en banc ) (cert.* pending).[28]

26. The letter has never been made a part of the record in this case. This Court therefore has no basis for determining if appellate counsel was ineffective for failing to raise the issue on direct appeal.

27. The *Shell* Court was reviewing the "especially heinous" formulation, with the following limiting definition given: "the word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others." *See Shell,* 111 S.Ct. at 313 (Marshall, J., concurring).

28. The Court notes that the holding in *Johnson* is before the Supreme Court by way of the grant in certiorari in *Sawyer v. Whitley,* 945 F.2d 812 (5th Cir.), *cert. granted,* — U.S. —, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991). The issue in *Sawyer* is:

What is the appropriate standard to be applied when determining whether "fundamen-

The exception applies only in the following situation:

> [B]ut for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, that he is *ineligible* for the death penalty.

*Id.* at 1183 (emphasis in original).

As the judge found three additional aggravators here, Robert would remain eligible for the death penalty even if the "especially heinous" circumstance is stricken. Under *Johnson,* this Court may not grant relief on this claim.[29]

■ B. *"Under Sentence of Imprisonment."* Petitioner attacks the jury instructions on the "under sentence of imprisonment at the time of the offense" aggravator. At the time of the instant crime, Roberts was in violation of parole for a rape and attempted murder committed in Maryland in 1974. The judge concluded that being on parole qualified as being under a "sentence of imprisonment," and instructed the jury accordingly.

The Florida Supreme Court found this claim to be procedurally barred for failure to raise it on direct appeal. *See Roberts,* 568 So.2d at 1258–59. This Court concludes that Petitioner cannot meet the cause and prejudice standard for this procedural lapse. Nor may Petitioner satisfy the "actual innocence" exception because Roberts would remain eligible for the death penalty even if this aggravator were

struck. *Johnson,* 938 F.2d at 1183; *see also Lindsey v. Smith,* 820 F.2d 1137 (11th Cir.1987) (no constitutional infirmity in considering parole as being "under sentence of imprisonment" where there were at least two other constitutionally sufficient circumstances), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989).

C. *"In the Course of a Felony."* Petitioner claims that his sentencing jury was not adequately instructed on the "in the course of a felony" aggravating circumstance. Roberts argues that his conviction for felony murder automatically produced a statutory aggravating circumstance, and he thus entered the sentencing phase already eligible for the death penalty in violation of *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

The Florida Supreme Court found this claim to be procedurally barred for failure to raise it on direct appeal. *See Roberts,* 568 So.2d at 1258–59. This Court concludes that Petitioner cannot meet the cause and prejudice standard for this procedural lapse. The actual innocence exception is foreclosed because this claim is meritless. *See Bertolotti,* 883 F.2d at 1527–28 (rejecting an identical claim, reasoning that "[i]n no sense did the jury's verdict of felony murder automatically predestine the judge's imposition of Florida's highest penalty").

D. *Mercy Instruction.* Petitioner's claim that the trial court failed to instruct the jury that sympathy or mercy may be considered during sentencing deliberations in violation of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), is likewise procedurally barred. During the guilt/innocence stages of the trial, the

---

tal miscarriage of justice" exception … will allow for consideration of claims presented in successor habeas corpus petition? Should focus be strictly on habeas petitioner's legalistic "eligibility" to be sentenced to death, and fail to require fact-based examination of accuracy of jury's decision, including whether 1) jury was presented with false facts, and 2) jury was not presented with true, mitigating facts? 60 U.S.L.W. 3531 (Feb. 4, 1992).

**29.** As noted, under the current law of this Circuit, Petitioner's claim would fail on the merits. *See Bertolotti v. Dugger,* 883 F.2d 1503, 1526–27

(11th Cir.1989) (rejecting challenge under *Cartwright,* 486 U.S. 356, 108 S.Ct. 1853 to Florida's "especially heinous" jury instructions), *reh'g denied,* ── U.S. ──, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990). Florida's construction of this aggravator will be reviewed by the Supreme Court in *Sochor v. Florida,* ── U.S. ──, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991). If the Eleventh Circuit's holding in *Johnson* is approved by the Supreme Court in *Sawyer,* this Court would be unable to review the merits of Petitioner's claim, even if *Sochor* is decided in Roberts' favor.

judge cautioned the jury not to allow sympathy, prejudice or bias to affect their verdict. The judge did not specifically instruct the jury otherwise at the *sentencing* phase. Counsel failed to raise the claim on direct appeal. *See Roberts*, 568 So.2d at 1258–59. Petitioner cannot show cause and prejudice for failing to bring the claim on direct appeal. As Petitioner would remain eligible for the death penalty even if a constitutional violation were found, the Eleventh Circuit's ruling in *Johnson* bars review of this mitigating factor. 938 F.2d at 1183.

■■■ E. *Burden Shifting at Penalty Phase.* Petitioner alleges that prosecutorial argument and judicial instructions improperly employed a "presumption of death which shifted to Roberts the burden of proving that life was the appropriate sentence." This claim may not be considered in this Court in light of the Florida Supreme Court's finding of a procedural bar. *See Roberts*, 568 So.2d at 1528–29. In essence, the claim attacks Florida's pattern jury instructions on the correct application of aggravating and mitigating circumstances. This Circuit has rejected a facial challenge to identical instructions. *See Bertolotti*, 883 F.2d at 1524–25. Therefore, no further review under the miscarriage of justice exception is warranted.

### 6. *Remaining Sentencing Phase Claims*

Petitioner's remaining claims are procedurally defaulted in this Court. Petitioner failed to bring the following four claims on direct appeal: (1) the state's closing argument in the guilt and penalty phases denied Roberts a fair and reliable capital sentencing; (2) Roberts' sentence of death was based upon an unconstitutionally obtained prior conviction; (3) nonstatutory aggravating factors were improperly introduced during the sentencing phase; and (4) the jury was allowed to consider victim-impact evidence in violation of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). As to each of these claims, the Court finds that Petitioner cannot show cause for the default and prejudice resulting therefrom. Even were the Court to find a constitutional violation as to one of the claims, Petitioner would remain "eligible" for the death penalty, and not "actually innocent" of the crimes for which he was convicted.

### 7. *Deprivation of a Fundamentally Fair Trial*

Petitioner's final claim alleges that his trial was fraught with such procedural and substantive errors as to deprive him of the fundamentally fair trial guaranteed under Sixth, Eighth, and Fourteenth Amendments. Based on the entire record and the foregoing resolution of Petitioner's claims, this contention must fail.

## V. CONCLUSION AND ORDER

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED, ADJUDGED, AND DECREED that Petitioner Rickey Bernard Roberts' Petition for Writ of Habeas Corpus be and the same hereby is DENIED.

DONE and ORDERED.